IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMMY BUCKNER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-17 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District Judge.

## I.      INTRODUCTION

Tammy Buckner ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq.* Plaintiff filed her applications on October 21, 2008 alleging disability since July 15, 2007 due to a neck and shoulder injury (AR 163-171; 179).[1] Her applications were denied (AR 57-58), and following a hearing held on December 15, 2012 (AR 31-56), the administrative law judge ("ALJ") issued his decision denying benefits to Plaintiff on February 24, 2011 (AR 15-27). Plaintiff's request for review by the Appeals Council was subsequently denied (AR 1-5), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Plaintiff's motion will be denied and the Commissioner's motion will be granted.

---

[1] References to the administrative record [ECF No. 7], will be designated by the citation "(AR ___)".

## II.    BACKGROUND

Plaintiff was 47 years old on the date of the ALJ's decision (AR 163).  She completed school through the eighth grade and reportedly had past work experience as a general laborer and a housekeeper (AR 35; 181).

On July 9, 2007, Plaintiff presented to the emergency room and complained of left shoulder pain since she fell of her bicycle on July 2, 2007 (AR 229-231).  X-rays of her left shoulder were negative, revealing no evidence of fracture, dislocation or significant arthritic changes, and the soft tissues were unremarkable (AR 234).  She was diagnosed with an acute left shoulder injury, prescribed Motrin and Flexeril, and was discharged in good condition (AR 230).

Plaintiff was seen by Anthony Snow, M.D. on July 22, 2008 and complained of left shoulder pain (AR 251).  Her physical examination revealed tenderness in the left shoulder, left trapezius area, and posterior cervical area (AR 251).  Dr. Snow diagnosed her with shoulder pain and neck pain, ordered diagnostic studies, and referred her to physical therapy (AR 251).  Plaintiff's cervical spine x-ray dated August 15, 2008 showed some spondylosis, with minimal bilateral C5-6 foraminal encroachment secondary to uncovertebral joint disease (AR 260).

Plaintiff returned to Dr. Snow on September 18, 2008 and complained of shoulder and back pain (AR 250).  On physical examination, Dr. Snow found multiple trigger points and referred her to trigger point massage therapy (AR 250).  She was diagnosed with shoulder pain and prescribed a Medrol dose pack (AR 250).

Plaintiff attended five physical therapy sessions from September 4, 2008 through October 3, 2008 (AR 254-259).  Plaintiff was discharged from physical therapy on October 3, 2008, and the discharge notes revealed that Plaintiff initially reported a decrease in her symptoms, but denied any lasting improvement (AR 254).  Plaintiff continually "asked for [an] MRI" and a change in her pain medications (AR 254).

Plaintiff returned to Dr. Snow on November 6, 2008 and continued to complain of left shoulder pain (AR 310).  On physical examination, Dr. Snow found some tenderness and decreased range of motion secondary to discomfort (AR 310).  He diagnosed Plaintiff with shoulder pain and prescribed amitriptyline and Neurontin (AR 310).

2

On November 14, 2008, Plaintiff completed a Function Report on a form supplied by the Commissioner (AR 198-207).  Plaintiff reported that she was able to care for her dog, was independent in her personal care, was able to prepare meals and perform household chores such as cleaning and laundry, and shop for groceries (AR 199-201).  Plaintiff further reported she watched television, went outside every day, and visited with friends and family on a regular basis (AR 201-202).  Plaintiff indicated she was able to follow written instructions, get along with authority figures, and handle changes in routine (AR 203-204).

On February 3, 2009, Plaintiff underwent a consultative examination performed by Paul Shields, D.O., pursuant to the request of the Commissioner (AR 261-266).  Plaintiff complained of neck and left upper arm pain (AR 261).  She relayed a lengthy history of crack cocaine abuse but reported she had been "clean" for seven months (AR 261).  Plaintiff believed some of her pain was related to her drug abuse and recent sobriety (AR 261).  Plaintiff reported that she worked steadily for 18 years until 2007, and had worked for one month in 2008 at a Microtel (AR 261).   Dr. Shields noted that Plaintiff was pleasant and cooperative, but she was tearful and her affect was "flat" (AR 261).  On physical examination, Dr. Shields found tenderness in her upper back, neck and shoulder (AR 262).  He further found that her fine and dexterous movements were normal (AR 262).  Plaintiff exhibited a full range of motion except in the shoulder and cervical regions (AR 265-266).  Dr. Shields reported on psychiatric examination that Plaintiff was fully oriented, her mood was depressed and her affect was flat, her memory was intact, and her insight and judgment were fair (AR 262).  Dr. Shields diagnosed Plaintiff with neck and arm pain, cocaine abuse in remission, and constipation (AR 262).

Dr. Shields completed a Medical Source Statement of Plaintiff's ability to perform work-related physical activities (AR 263).  Dr. Shields concluded that Plaintiff could frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds; sit, stand and walk for four hours each in an 8-hour day with a sit/stand option; occasionally perform postural activities; and was limited in reaching with her left arm (AR 263-264).

On February 4, 2009, Manella Link, Ph.D., a state agency reviewing psychologist, reviewed the medical evidence of record and concluded that Plaintiff did not have a severe

mental impairment (AR 267). Dr. Link found that Plaintiff had only mild restrictions in her activities of daily living, no difficulties in social functioning, no difficulties in maintaining concentration, persistence and pace, and there were no repeated episodes of decompensation (AR 277). Dr. Link observed that Plaintiff had no prior mental treatment (AR 279). He further observed that at her consultative examination, Dr. Shields found she was fully oriented, her memory was intact and her insight and judgment were fair (AR 279).

Plaintiff returned to Dr. Snow on February 16, 2009 and complained of back and left arm pain (AR 307). Plaintiff denied a history of trauma, falls or injuries (AR 307). Dr. Snow reported that Plaintiff was very pleasant, cooperative and in no acute distress (AR 307). On physical examination, Dr. Snow found she had a decreased range of motion in her left arm and shoulder area, and there was tenderness in the lumbosacral spinal area into her hips (AR 307). Dr. Snow diagnosed Plaintiff with shoulder and back pain, increased her amitriptyline dosage and referred her for cervical and lumbar spine x-rays (AR 307).

On May 5, 2009, Plaintiff sought mental health treatment at Safe Harbor Behavioral Health (AR 330-334). Plaintiff complained of depression and disturbances in her sleep, appetite, energy level, and concentration difficulties (AR 330). She also reported fleeting suicidal ideations but denied any plan or intent (AR 330). Plaintiff indicated that she previously self-medicated with alcohol and drugs, and continued to smoke marijuana a "few times a week" to help her sleep and deal with her pain (AR 330). On mental status examination, Plaintiff was fully oriented, cooperative, maintained good eye contact and displayed good hygiene (AR 332). Her speech was spontaneous, her affect was appropriate, her memory was intact, and her insight and judgment were "good" (AR 332). Her thought processes were organized and relevant, although Plaintiff reported hearing voices (AR 332). Plaintiff was diagnosed with major depressive disorder, recurrent episode, and combination of opioid type drug use with other drugs (AR 333). She was assessed with a Global Assessment of Functioning ("GAF") score of 50,[2] scheduled for a psychiatric evaluation, and referred to therapy (AR 333).

---

[2]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score

4

Plaintiff returned to Safe Harbor on August 24, 2009 and underwent a psychiatric evaluation performed by L. Eberly, D.O. (AR 326-328).  Plaintiff complained of depression, low energy, decreased concentration, poor sleep, feelings of worthlessness, and auditory and visual hallucinations (AR 326).  Plaintiff reported a history of crack cocaine dependency lasting 26 years, but claimed she had been clean for one year (AR 326).  She admitted however, that she continued to use marijuana daily (AR 326).  On mental status examination, Dr. Eberly reported that Plaintiff was alert, fully oriented, friendly, attentive, cooperative, not agitated and had good eye contact (AR 327).  Her speech was normal, coherent, and spontaneous with adequate content (AR 327).  Her thought processes were coherent and organized without any suicidal ideations, her intellect was average, and her cognition and memory were intact (AR 327).  Her mood was reported as "very depressed" and her affect was "depressed" (AR 327).  Plaintiff was prescribed Celexa and Seroquel, and was advised that her symptoms could be the result of her substance abuse (AR 327).  Dr. Eberly requested that she discontinue her marijuana usage so she could be evaluated during a period of sobriety (AR 327).  It was further recommended that Plaintiff continue with therapy, which Plaintiff reportedly found "extremely beneficial" (AR 328).  Dr. Eberly diagnosed Plaintiff with a drug-induced mood disorder, with the need to rule out a diagnosis of major depressive disorder with psychotic features, and cannabis dependence, unspecified use, and assigned her a GAF score of 49 (AR 328).

On October 27, 2009, Plaintiff returned to Dr. Snow and complained of increased neck pain (AR 303).  Dr. Snow found tenderness in the left side of her neck (AR 303).  He prescribed Nalfon and Robaxin, and referred her to UPMC for her neck pain (AR 303).

Plaintiff was seen by Dr. Eberly on November 3, 2009, and reported feeling "so-so" (AR 324).  She claimed that she felt people were watching her through the cracks in her house (AR 324).  She admitted to continued marijuana usage (AR 324).  Plaintiff reported no side effects

---

considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" OR "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

from her medications (AR 324).  It was noted that her mood was "depressed" and her Celexa dosage was increased (AR 324-325).  She was assigned a GAF score of 50 (AR 324).

On November 18, 2009, Plaintiff was seen by Alka Kaushik, M.D. at UPMC and complained of neck and upper arm pain (AR 295).  She was administered trigger point injections in her left trapezius muscle and paracervical muscle (AR 294).

Plaintiff returned to Dr. Eberly on December 17, 2009, and reported an improvement in her depression and sleep (AR 322).  She claimed she had decreased her marijuana usage to "2 joints a week" (AR 322).  Plaintiff reported that she had not seen her therapist for awhile but that counseling had been "very helpful" (AR 322).  On mental status examination, Dr. Eberly reported that Plaintiff was friendly and cooperative, her mood was "less depressed," her affect was "brighter," and she denied any suicidal thoughts (AR 322).  Her diagnosis remained unchanged, and her GAF score had improved to a 52 (AR 323).[3]

When seen by Dr. Eberly on January 29, 2010, Plaintiff reported that she had used marijuana recently while attending her uncle's funeral (AR 320).  She indicated that she felt "good" when she took her medications regularly (AR 320).  On mental status examination, Dr. Eberly reported that she was cooperative, her mood and affect were depressed, and she denied any suicidal thoughts (AR 320).  Her diagnosis and GAF score remained unchanged (AR 320-321).

On February 2, 2010, Plaintiff returned to Dr. Kaushik and reported that the intensity of her pain had decreased and that her shoulder and neck range of motion had increased (AR 293).  Dr. Kaushik administered a trigger point injection in Plaintiff's left trapezius muscle (AR 292).  Plaintiff's cervical MRI dated February 19, 2010 revealed only mild degenerative disc disease without spinal cord or nerve root impingement (AR 302).  On February 24, 2010, Plaintiff continued to complain of neck and shoulder pain when see by Dr. Kaushik, but indicated that Neurontin helped her pain and her sleep was "good" (AR 290).  Dr. Kaushik recommended an orthopedic evaluation for her shoulder if her pain continued (AR 290).

---

[3] An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., no friends, conflicts with peers or co-workers)." *Id*.

Plaintiff returned to Dr. Eberly on March 11, 2010 (AR 318). Dr. Eberly reported on mental status examination that Plaintiff was friendly, cooperative, talkative and engaging, with good eye contact, grooming and hygiene (AR 318). Her depression and paranoia had improved and she denied any suicidal ideations (AR 318). Plaintiff's diagnosis remained unchanged and she was assigned an improved GAF score of 55 (AR 319). She was instructed to continue taking Celexa and her Seroquel dosage was increased (AR 319).

On March 29, 2010, Plaintiff was seen by Dr. Snow and requested an orthopedic referral for her left shoulder pain (AR 301). Dr. Snow found some "vague" tenderness in the posterior cervical area with a decreased range of motion, and some tenderness in her left shoulder area (AR 301). She was diagnosed with shoulder pain and referred for an orthopedic consult (AR 301).

Plaintiff received cervical epidural steroid injections administered by Dr. Kaushik on May 18, 2010 and June 10, 2010 (AR 286-289). When seen by Dr. Snow on June 28, 2010, Plaintiff reported that injection therapy had been helpful (AR 300). Dr. Snow reported Plaintiff was "very pleasant" and in no acute distress, and her neck was supple on physical examination (AR 300). She was diagnosed with chronic back pain (AR 300).

Finally, on November 15, 2010, Plaintiff returned to Dr. Eberly and reported that she had been out of her medications for one month (AR 316). Dr. Eberly noted that Plaintiff had missed her last five appointments with him and had not attended therapy since April (AR 316). Plaintiff reported that she was depressed and had trouble sleeping, and requested that her medications be restarted (AR 316). Plaintiff admitted to using marijuana only "once in a blue moon" (AR 316). On mental status examination, Dr. Eberly found Plaintiff friendly and cooperative with good eye contact, grooming and hygiene (AR 316). Her mood and affect were depressed, but Plaintiff denied any suicidal thoughts (AR 316). She was diagnosed with major depressive disorder, recurrent episode, severe, and cannabis dependence, unspecified use (AR 316). She was assessed with a GAF score of 54 and prescribed Celexa and Seroquel (AR 317).

Plaintiff and Fred Monaco, a vocational expert, testified at the hearing held by the ALJ on December 15, 2010 (AR 31-55). Plaintiff testified that she had consistently worked since age

7

16, but at the time of the hearing was unable to work due to severe spinal arthritis and a left shoulder injury (AR 37-38; 43).  Plaintiff stated that she suffered from severe pain in her neck, back, left arm and fingers (AR 38).  Plaintiff further stated that she occasionally had problems getting out of the bathtub and lost her balance at times (AR 39).  She claimed that she occasionally became fatigued while walking and that her legs "hurt a little" (AR 40).  Plaintiff testified that she was also depressed and no longer socialized with family or friends (AR 41).  With respect to her physical impairments, Plaintiff indicated that she took medication and had undergone epidural injections (AR 39).  She also took medications for her mental impairments, but claimed she briefly stopped taking them because she was unable to leave her home due to depression (AR 42).  Plaintiff acknowledged a history of drug use, and testified that she had not used cocaine for the past three years (AR 43-44).  Plaintiff admitted, however, to using marijuana one week prior to the hearing (AR 44).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as the Plaintiff, who was capable of lifting ten pounds occasionally and five pounds frequently, and capable of sitting for four hours and standing and walking for four hours, with the option to sit or stand, changing position at a maximum frequency of every thirty minutes (AR 52).  The hypothetical individual was further limited to simple, routine, and repetitive work, not fast-paced, involving only simple work decisions (AR 52).  In addition, the hypothetical individual was limited to occasional interaction with supervisor, coworkers and the general public, and would have minimal use of her left arm (AR 53).  The vocational expert testified that such an individual could perform the jobs of a surveillance system monitor, document preparer, and production checker (AR 53).

Following the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled within the meaning of the Act (AR 15-27).  Her request for an appeal with the Appeals Council was denied, rendering the ALJ's decision the final decision of the Commissioner (AR 1-5).  She subsequently filed this action.

### III.   STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).  It has been defined as less than a preponderance of evidence but more than a mere scintilla.  *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.  A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings.").  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole.  *See* 5 U.S.C. § 706.

### IV.   DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity.  42 U.S.C. § 423(d)(1)(A).  Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels.  42 U.S.C. § 1382(a).  A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI.  *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a).  In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the

9

expiration of his insured status. 42 U.S.C. § 423(a), (c).  The ALJ found that the Plaintiff met the disability insured status requirements of the Act through March 31, 2010 (AR 15).  SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner uses a five-step evaluation process to determine when an individual meets this definition.  *See* 20 C.F.R. §§ 404.1520; 416.920.  The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Here, the ALJ concluded that Plaintiff had the following severe impairments: left shoulder disorder; neck disorder; back disorder; gastroesophageal reflux disease; major depressive disorder, recurrent episode, moderate; and "combinations of opioid type drug with any other drug dependence unspecified use", but determined at step three that she did not meet a listing (AR 17-20).  The ALJ described the Plaintiff's residual functional capacity as follows:

> …[T]he claimant has the residual functional capacity to perform sedentary work
> as defined in 20 CFR 404.1567(a) and 416.967(a) except she would be able to lift
> 10 pounds occasionally and 5 pounds frequently.  She would be able to sit for four

hours and stand or walk for four hours.  She should be afforded the option to sit or stand, changing position at a maximum frequency of every 30 minutes.  She would be limited to simple, routine and repetitive work, not fast-paced and only simple work decisions.

(AR 20).  At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 26).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Plaintiff's first challenges the ALJ's residual functional capacity ("RFC") determination. *See* [ECF No. 10] pp. 10-11.  "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft*, 181 F.3d at 359 n.1); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a).  An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2).  In making this determination, the ALJ must consider all the evidence before him.  *Burnett*, 220 F.3d at 121.  This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others."  *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001).  Moreover, the ALJ's finding of RFC must "be accompanied by a clear and satisfactory explication of the basis on which it rests."  *Id*. (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Plaintiff argues that the ALJ failed to identify the medical opinions he relied upon in fashioning her RFC, and that he failed to assign significant or controlling weight to any of the medical evidence of record, or explain how he determined her functional limitations.  *See* [ECF No. 10] pp. 10-11.  We disagree.

In fashioning Plaintiff's RFC the ALJ stated:

[B]ased upon the substantial weight of the objective medical evidence, the claimant's course of treatment, her level of daily activity, her work history and the medical opinions, which have been given the appropriate weight for the reasons cited above, I find that the claimant retains the residual functional capacity for work identified above.

(AR 25). Specifically, the ALJ reviewed the emergency room records and observed that Plaintiff's left shoulder x-rays were negative, and she was not prescribed any narcotic pain medication following her visit in July 2007 for shoulder pain (AR 21). The ALJ also reviewed Dr. Snow's treatment note entries, observing that Dr. Snow had noted some tenderness in Plaintiff's left shoulder, left trapezius and posterior cervical areas, and that he had referred her for x-rays and physical therapy in July 2008 (AR 21). The ALJ further observed that Dr. Snow diagnosed Plaintiff with shoulder pain in September 2008, and recommended trigger point massage and prescribed medication (AR 22). The ALJ found that Dr. Snow prescribed Plaintiff medication in November 2008, and continued to treat her conservatively in February, April, June, August and October 2009, and that he had prescribed medication at her most recent visit in October of 2010 (AR 22).

The ALJ noted that Plaintiff had participated in physical therapy in September and October 2008, but was discharged because she failed to improve (AR 22). The ALJ reviewed Dr. Kaushik's treatment notes, observing that Plaintiff had received trigger point injections in her left trapezius muscle and parcervical muscle in November 2009 and February 2010, and had undergone cervical epidural injections in May and July 2010 (AR 22). The ALJ observed that Plaintiff reported to Dr. Snow in June 2010 that injection therapy had been helpful (AR 22). The ALJ further discussed the results of Plaintiff's diagnostic studies, noting that her cervical x-rays in August 2008 showed some spondylosis and minimal bilateral C5-6 foraminal encroachment (AR 21). He further noted that a February MRI revealed only mild cervical degenerative disc disease, with no evidence of spinal cord or nerve root impingement (AR 22).

The ALJ also reviewed Dr. Shields' consultative examination results in February 2009 (AR 22). He observed that Dr. Shields found Plaintiff was in no distress, she had normal fine and dexterous movements, and had a full range of motion except for in the cervical region and the shoulders (AR 22). The ALJ concluded that the objective evidence relative to Plaintiff's physical impairments did not prevent her from engaging in a restricted range of sedentary work (AR 21-22).

The ALJ further reviewed and discussed the Plaintiff's mental health treatment records from Safe Harbor (AR 22-23).  The ALJ observed that Plaintiff first sought mental health treatment in May 2009 for depression, but admitted that she continued to use marijuana (AR 22).  Although she was assessed a GAF score of 50, which the ALJ recognized was indicative of serious symptoms, the ALJ also noted that her mental status examination revealed that she was alert and oriented with an appropriate affect, intact memory, average intellect, good insight and good judgment (AR 22).  In August 2009, Plaintiff continued to complain of depression and hallucinations, but she admitted to continued drug use (AR 23).  The ALJ noted that Dr. Eberly suggested Plaintiff's symptoms could be the result of Plaintiff's chronic marijuana usage, and that she was advised to stop using marijuana (AR 23).  She was assigned a GAF score of 49 and diagnosed with a drug-induced mood disorder (AR 23).  The ALJ observed that in December 2009, Plaintiff had decreased her marijuana usage and Dr. Eberly found that she was less depressed (AR 23).  The ALJ further observed that Plaintiff had an improved GAF score of 52, which was indicative of only moderate symptoms, and she reported doing "good" when she regularly took her medications (AR 23).

The ALJ found that in May 2010, Plaintiff's therapy had been discontinued because she had missed too many appointments (AR 23).  Plaintiff had decreased her marijuana usage and her GAF score had increased to 55 (AR 23).  The ALJ noted that at her last appointment in November 2010, Plaintiff reported that she had been out of her medications for months and admitted to only using marijuana "once in a blue moon" (AR 23).  The ALJ found it significant that in May 2010, even though Plaintiff was not taking her medications, Dr. Eberly found her to have a stable GAF score of 54, again indicating only moderate symptoms (AR 23).  The ALJ concluded that the objective evidence in its entirety did not demonstrate such abnormalities which would interfere with Plaintiff's ability perform simple, routine and repetitive work, not fast-paced and involving only simple work decisions (AR 23).

The ALJ reviewed and discussed the opinion evidence, observing that Dr. Shields found Plaintiff was capable of performing a full range of light work, except that she would be limited to standing and walking for four hours in an 8-hour day, sitting for four hours in an 8-hour day,

with sitting/standing at her option, and performing occasional postural activities and restricted reaching with her left upper extremity (AR 24).  The ALJ accorded Dr. Shields' assessment "some weight" since he found it generally consistent with the medical record as a whole (AR 25).  However, the ALJ concluded that Plaintiff had greater limitations than those found by Dr. Shields, and restricted Plaintiff to lifting only up to ten pounds occasionally and five pounds frequently (AR 25).  The ALJ similarly accorded "some weight" to the assessment of Dr. Link, who concluded that Plaintiff had no medically determinable mental impairment (AR 25).  The ALJ recognized, however, that the medical evidence revealed that Plaintiff's depression and drug dependence were severe impairments resulting in moderate difficulties in her concentration abilities (AR 19).  The ALJ therefore limited Plaintiff to work involving only simple, routine, repetitive work that was not fast paced and did not involve more than simple work decisions (AR 20).

The ALJ did not, as the Plaintiff suggests, rely upon his own medical analysis in fashioning her RFC to the exclusion of "contrary medical evidence."  *See* [ECF No. 10] p. 10.  No treating or examining physician provided an assessment that Plaintiff had functional limitations that would prevent her from engaging in the range of work found by the ALJ.  In addition, as found by the ALJ and discussed above, Plaintiff's medical records do not support a functional inability to work.  Finally, Plaintiff does not point to any medical evidence that the ALJ rejected outright or failed to consider, nor has she presented any evidence that her impairments caused any additional functional limitations beyond those accounted for by the ALJ in his RFC assessment.  In sum, the ALJ complied with his obligations pursuant to the forgoing standards and adequately explained the basis of his RFC determination and the weight he accorded to the opinions of Dr. Shields and Dr. Link.  We therefore find no error in this regard.

Plaintiff further argues that because Dr. Link was a non-examining state agency physician whose "form report" was "weak evidence at best," his findings do not meet the substantial evidence test and should not have been given any weight.  *See* [ECF No. 10] p. 11.  Contrary to Plaintiff's argument however, Dr. Link's assessment was accompanied by an explanation for his findings.  In concluding that Plaintiff had no medically determinable mental

impairment, Dr. Link observed that Plaintiff completed school through the 9th grade and had not attended any special education classes (AR 279). He further observed that Plaintiff claimed somewhat limited daily activities, but concluded that she was only partially credible, noting that she was on no medications and had not had any prior mental health treatment (AR 279). Dr. Link further observed that Plaintiff had a history of crack cocaine usage and had been sober for seven months (AR 279). He also noted that Plaintiff considered her pain to be related to her drug abuse and recent sobriety (AR 279). Finally, Dr. Link found that at her consultative examination, Dr. Shields reported that Plaintiff was fully oriented, her memory was intact, and her insight and judgment were "fair" (AR 279).

Plaintiff further argues that Dr. Link's assessment should not have been accorded any weight since it was rendered without a review of the full record. *See* [ECF No. 10] p. 11. However, the fact that Dr. Link's assessment was rendered earlier in time does not require that it be assigned no weight. The Third Circuit has specifically addressed this issue, noting: "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012).

In a related argument, Plaintiff contends that the ALJ failed to complete the record with respect to her mental impairments by either recontacting Dr. Eberly or sending her for a consultative examination. *See* [ECF No. 10] Plaintiff's Brief pp. 11-12. The regulations provide that an ALJ must recontact a medical source "when the report from [Plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (quoting 20 C.F.R. § 416.912(e)(1)).[4]  Recontact is only required however, when "the

---

[4] The SSA eliminated this provision and § 404.1512(e)(1), effective March 26, 2012. *See generally* How We Collect and Consider Evidence of Disability, 77 Fed.Reg. 10,651 (Feb. 23, 2012). The new protocol for recontacting medical sources is set forth in 20 C.F.R. §§ 404.1520b, 416.920b. *See Gray v. Astrue*, 2012 WL 1521259 at *3 n.1 (E.D.Pa. 2012).

evidence we received from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled." *Id.* Similarly, the duty to order a consultative examination is only necessary where the claimant has shown that the record as developed is not sufficient for the ALJ to make a determination. *Thompson v. Halter*, 45 Fed. Appx. 146, 149 (3d Cir. 2002) (citing 20 C.F.R. §§ 404.1517, 416.917). Other circumstances necessitating a consultative examination include situations where a claimant's medical records do not contain needed additional evidence, or when the ALJ needs to resolve a conflict, inconsistency or ambiguity in the record. *See* 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

Here, for the reasons discussed above, we find that the record was sufficiently developed for the ALJ to make a disability determination. Without repeating such findings, we observe that the ALJ thoroughly examined and discussed the Plaintiff's mental health treatment history, including her reported symptoms, Dr. Eberly's observations and findings on mental status examination, Plaintiff's diagnoses, and the various GAF scores assigned throughout her treatment history (AR 22-23). The ALJ also reviewed and discussed the Plaintiff's written statements to the agency and her testimony from the hearing (AR 19; 21; 24). Consequently, we conclude that the ALJ did not err in failing to further develop the record.

## V.   CONCLUSION

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAMMY BUCKNER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-17 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 5th day of November, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF. No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 11] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Tammy Buckner.

The clerk is directed to mark the case closed.



s/ Sean J. McLaughlin
United States District Judge



cm:    All parties of record

17